UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEXTER E. DALE, | No. C 04-0043 JSW (PR) |
| Plaintiff, | (Santa Clara County Superior Court, Case No. 1-03-CV-007839) |
| v. | |
| C. BETANCOURT, et al., | **ORDER GRANTING DEFENDANT BETANCOURT'S MOTION FOR SUMMARY JUDGMENT ON FEDERAL CONSTITUTIONAL CLAIMS, AND REMANDING SUPPLEMENTAL STATE LAW CLAIMS TO STATE COURT** |
| Defendants. | |

(Docket no. 29)

## INTRODUCTION

Plaintiff Dexter E. Dale is a prisoner of the State of California who is incarcerated at the Correctional Training Facility (CTF) at Soledad. He originally filed this pro se civil rights action under 42 U.S.C. § 1983 in Santa Clara County Superior Court against various CTF prison officials. Defendants then removed the action to federal court. On initial review of the complaint, the Court found cognizable against Correctional Officer Betancourt federal constitutional claims for deliberate indifference to Plaintiff's safety and retaliation. The Court also found cognizable a federal constitutional claim for deliberate indifference to Plaintiff's medical needs against Jane Does (1) and (2), and state law claims against Correctional Officer Betancourt, CTF Chief Medical Officer Friedman, CTF Warden Hamlet, and Director of the Department of Corrections Alameida. The latter four Defendants filed a Rule 12(b) motion to dismiss which, in an order dated March 9, 2005, the Court denied. The Court ordered Defendants to file another dispositive motion, and dismissed the two Doe Defendants. Therefore, the only claims that remain are the safety and retaliation claims against Defendant Betancourt, and the state law claims against Defendants Betancourt, Friedman, Hamlet and Alameida.

Defendants have moved for summary judgment on the grounds that there is no issue as to any material fact, they are entitled to judgment as a matter of law, there is no respondeat

superior under § 1983, and they are entitled to qualified immunity. Plaintiff has filed an opposition to Defendants' motion. For the reasons discussed below, the Court GRANTS the motion for summary judgment with respect to the federal constitutional claims against Defendant Betancourt, and REMANDS the remaining supplemental state law claims to be decided in state court.

**BACKGROUND**

The following facts are taken from Defendants' motion for summary judgment and the attached declaration of Defendant Betancourt, and from Plaintiff's verified complaint and opposition and the exhibits in support thereof. The facts are undisputed unless otherwise noted.

As of April 16, 2003, Defendant Betancourt was the correctional officer assigned to the CTF-Central Culinary as a Search and Escort Officer. Among his responsibilities were to maintain order, discipline and security, and to supervise inmates within his assigned area. At that time, Plaintiff and another inmate by the name of Martin were inmate workers under Defendant Betancourt's supervision.

Around or in April 2003, Defendant Betancourt made some changes to the work schedule of every inmate on his team in order to fill some vacancies and to ensure the coverage of duties and days. The only change made to plaintiff's work schedule was the assignment to clean one additional inmate restroom.

Shortly after the changes were made, Defendant Betancourt discussed the changes with each inmate on his team and asked for their feelings about the changes. The parties agree that Plaintiff was not happy with the changes. He states that he confronted Defendant Betancourt regarding the changes and also voiced his opposition to the changes at a work crew meeting, where he was the only prisoner to object. Defendant Betancourt does not mention this objection, but does state that when he spoke with Plaintiff, Plaintiff refused to cooperate with the revised work schedule.

On April 16, 2003, at approximately 5:45 p.m., inmate Martin came to Defendant Betancourt's office and indicated he was having problems with a co-worker inmate. Citing to

2

Defendant Betancourt's declaration, Plaintiff states that Martin told Defendant Betancourt that Plaintiff was the other inmate. However, Defendant Betancourt expressly states that Martin did not name the inmate. Inmate Martin asked Defendant Betancourt if he would talk to the other inmate. Defendant Betancourt told Martin to have the other inmate come to see him in his office and they could discuss the problem. Instead, Martin indicated that he would make another attempt to talk to this inmate, and left Defendant Betancourt's office. Defendant Betancourt declares that he observed that Martin was calm.

According to Defendant Betancourt's declaration, when Martin returned to Defendant Betancourt's office Martin was "visibly upset and agitated and indicated that Plaintiff was the inmate he was having problems with." Betancourt Decl. at 2 ¶ 6. Defendant Betancourt walked with Martin out of his office and watched Martin approach Plaintiff and say, "Come on, Dale, we got to talk about this. We got Betancourt here, let's go to the office." *Id.* Defendant Betancourt observed that Plaintiff made hand gestures indicating he was not interested in talking. At that time, the phone rang in Defendant Betancourt's office. He asked Martin if everything was fine, and Martin stated, "yea, yea, whatever." *Id.* at ¶ 7. Defendant Betancourt then left to answer the phone while still keeping both inmates within his sight. The phone was located approximately fifteen feet away from the inmates, in an office with an open view and an unlocked door.

Defendant Betancourt declares that while he was on the phone he observed that Martin was calm and attempting to talk to Plaintiff in a calm manner. He did not hear what Plaintiff mumbled to Martin in response, but whatever Plaintiff said caused Martin's demeanor to suddenly change. He heard Martin state, "You know I don't get down like that." *Id.* at 3 ¶ 8. Martin then pushed Plaintiff in the chest with two open hands, toward the wall. Defendant Betancourt immediately instructed Martin to stop. He then observed Plaintiff punch Martin in the upper torso area with a right closed fist punch.

Defendant Betancourt states that he instructed both inmates to stop fighting and get down, and when they ignored his orders he pulled out his pepper spray and yelled twice, "O.C., get down!" He then activated his Central Culinary alarm and sprayed two bursts of

3

pepper spray at both inmates. Plaintiff states that Defendant Betancourt did not give a warning before he sprayed Plaintiff. After being sprayed both inmates, still in a headlock, fell to the floor.

Other correctional officers rushed to the scene, separated the inmates, handcuffed them both and took them to the shower to be decontaminated. After both inmates received showers they were taken to Central Health Services for a medical evaluation. Martin was treated for small bumps on the right temple and the left side of his forehead, and that Plaintiff received several superficial injuries including a minor laceration to the left eyebrow. Plaintiff refers to an attached medical report filed on the date of the incident which describes his injuries as a 1 1/2" laceration/tear on his posterior neck, a below-the-ear lateral face tear, a skin tear at 1" anterior knee, a skin tear on the right elbow, a skin tear on the left wrist, a laceration on the right eyebrow, and a skin tear on the right jaw. *See* Compl., Ex. M. at 61. He also refers to medical records which show that on May 5, 2003, he started complaining of left knee pain which occurred as a result of having been kicked and falling on his knee during the incident. As a result of the pain Plaintiff ended up being medically unassigned to work, and was sent to an orthopedic specialist and given an x-ray, which showed a left knee fracture.

After the incident both inmates were issued CDC 115 Rules Violation Reports (RVR) for the charge of mutual combat with use of force. An administrative hearing for Plaintiff's RVR was held on May 13, 203  At this hearing, Plaintiff called Defendant Betancourt, as well as another inmate as a witness. At the conclusion fo the hearing it was found that although Plaintiff was engaged in mutual combat with Martin, his actions were that of self-defense, and that Plaintiff did not use force which exceeded that necessary to defend himself. Plaintiff's RVR was dismissed.

While Plaintiff was away from work Defendant Betancourt assigned another inmate to cover Plaintiff's work responsibilities. When Plaintiff returned to work, Defendant Betancourt changed Plaintiff's days off from Friday and Saturday to Monday and Tuesday. On May 7, 2003, Defendant Betancourt issued a CDC 128-B Informational Chrono to

4

Plaintiff, in which he wrote that Plaintiff's work performance and attitude had declined as a result of Plaintiff's dissatisfaction with his new work schedule. Plaintiff states that report was false, because he had not even been working during that period. He appealed against the issuance of the Chrono and the appeal was upheld. Defendant Betancourt was ordered to remove the Chrono from Plaintiff's file, which Plaintiff maintains was done initially but was then replaced. Defendant Betancourt restored Plaintiff's old work schedule to him by giving him Fridays and Saturdays off.

No disciplinary or adverse actions were taken against Defendant Betancourt as a result of the events concerning Plaintiff which occurred on April 16, 2003.

## DISCUSSION

I.   Standard of Review

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*

The moving party for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v Cattrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. But on an issue for which the opposing party will have the burden of proof at trial, as is the case here, the moving party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). If the nonmoving party fails to make

5

this showing, "the moving party is entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323.

Where, as is the situation with a qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). The moving party must establish the absence of a genuine issue of fact on each issue material to his affirmative defense. *Id.* at 1537; *see also Anderson,* 477 U.S. at 248. When the moving party has come forward with this evidence, the burden shifts to the nonmoving party to set forth specific facts showing the existence of a genuine issue of fact with respect to the affirmative defense.

A court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence and the inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *See id.* at 631. A verified pleading may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

II.   Analysis

   A.   Deliberate Indifference to Plaintiff's Safety

The Eighth Amendment's prohibition of cruel and unusual punishment requires that prison officials take reasonable measures to provide for the safety of inmates. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). In particular, officials have a duty to protect inmates from violence at the hands of other inmates. *See id.* at 833. A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's safety. *See id.* at 834.

To be liable in a failure to prevent harm situation, the official must know of and

6

disregard an excessive risk to inmate safety. *See id.* at 837. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference. *See id.* He need not "believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before [he] is obligated to take steps to prevent such an assault." *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). Before being required to take action he must, however, have more than a "mere suspicion" that an attack will occur. *See id.; see, e.g., id.* at 460 (summary judgment appropriate as to defendants when plaintiff "failed to come forward with any facts showing that these defendants had any reason to believe he would be attacked by the assailant").

When, as here, the prisoner seeks damages against a defendant, the "inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). *Leer* explained that "it is important to distinguish the causal connection required when a plaintiff seeks injunctive or declaratory relief as opposed to damages." *Id*. In the former case, a broader and more generalized approach to causation is taken. *See id.*

> When plaintiffs, such as the inmates, seek to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the eighth amendment deprivation must be more refined. We must focus on whether the individual defendant was in a position to take steps to avert the [harm], but failed to do so intentionally or with deliberate indifference. In order to resolve this causation issue, we must take a very individualized approach which accounts for the duties, discretion, and means of each defendant. . . . Sweeping conclusory allegations will not suffice to prevent summary judgment. . . . The prisoner must set forth specific facts as to each individual defendant's deliberate indifference.

*Id*. at 633-34 (citations omitted).

Plaintiff maintains that Defendant Betancourt was deliberately indifferent to Plaintiff's safety based on the following, When Betancourt took issue with Plaintiff's initial voiced opposition to the changes in work schedule at a meeting with other inmates, Betancourt set in motion a series of retaliatory events which led to Plaintiff being attacked. When Martin first came to Betancourt and told him that he was having a problem with another inmate and

7

asked Betancourt to intervene, Betancourt "for all purposes was warned of a risk or possible harm to either Martin or Plaintiff [] [t]o which Betancourt was indifferent." Opp. at 4. He maintains that as an officer and work supervisor, Betancourt owed a duty to Plaintiff to warn him of the "potential harm" and to a duty to protect Plaintiff. *Id*. He further states that "Due to the special relationship between the attacker and Betancourt, a duty was owed to control Martin." *Id*. The second warning came when Martin returned to Defendant Betancourt's office visibly upset and agitated. At that point, he maintains that Betancourt had a duty to take control of the situation, but instead allowed Plaintiff to be attacked, and then joined in the attack by pepper-spraying him.

Plaintiff has failed to raise a triable issue as to whether Defendant Betancourt acted with deliberate indifference to Plaintiff's safety. He argues essentially that Defendant Betancourt, as a correctional officer, should have known that when one inmate voices an objection in front of other inmates, and another inmate later complains to the correctional officer that he disagrees with or is having a problem with the first inmate, the correctional officer is on notice that the objecting inmate will be attacked. However, the facts as alleged support at most an argument that Defendant Betancourt was negligent for failing to protect Plaintiff. However, as the Supreme Court made clear in *Farmer*, 511 U.S. at 835-36 & n.4, negligence and even gross negligence are not enough to amount to an Eighth Amendment violation. Deliberate indifference is not shown by merely stating that a defendant should have known of a risk. The case law could not be clearer that deliberate indifference requires an actual perception of a risk and does not exist merely where a reasonable person should have perceived a risk.

To survive the summary judgment motion, Plaintiff was required to raise a triable issue of fact as to the objective and subjective prongs of the deliberate indifference standard. He has not raised a triable issue that Defendant Betancourt was subjectively, deliberately indifferent to a risk to his safety. Even viewing the evidence and the inferences drawn therefrom in the light most favorable to Plaintiff, no reasonable jury could return a verdict for him and against Defendant Betancourt. Therefore, Defendant Betancourt is entitled to

judgment as a matter of law on the deliberate indifference to safety claim.

      B.      Qualified Immunity

The Court further finds that Defendant Betancourt is entitled to qualified immunity on the claim of deliberate indifference. The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The rule of qualified immunity "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'" *Burns v. Reed*, 500 U.S. 478, 495 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a particular sequence of questions to be considered in determining whether qualified immunity exists. The court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. *See id.* If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The first step under *Saucier* is to determine whether a constitutional violation was alleged. Plaintiff's complaint sufficed to allege an Eighth Amendment claim.

The next step under *Saucier* is to consider whether the contours of the right were clearly established, an inquiry that "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. The law was clearly

9

established that a correctional officer could not disregard a substantial risk of serious harm to an inmate of which he was aware, and that he had a duty to protect a prisoner from violence at the hands of other prisoners. *See Farmer v. Brennan*, 511 U.S. at 833. The Ninth Circuit further clarified the qualified immunity analysis for a deliberate indifference claim in *Estate of Ford v. Ramirez- Palmer*, 301 F.3d 1043 (9th Cir. 2002). The court explained that, for an Eighth Amendment violation based on a condition of confinement (such as a safety risk), the prison official must subjectively have a sufficiently culpable state of mind. The court held,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inferences . . . . Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity.

*Id.* at 1050 (quoting *Saucier*, 533 U.S. at 205).

The court explained that even though the general rule of deliberate indifference had been expressed in *Farmer*, no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" *Id.* at 1051 (quoting *Farmer*, 511 U.S. at 834 n.3). Because *Farmer* left open the question of when it would be clear to a reasonable prison official that the risk of harm to one inmate from another changes from being a risk of some harm to a substantial risk of serious harm, "[t]his necessarily informs 'the dispositive question' of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they] confronted." *Id.*

Applying *Estate of Ford* to the facts here, the Court finds that it would not have been clear to a reasonable prison official when the risk of harm from allowing Plaintiff and inmate Martin to interact with one another regarding the issue of the change in work schedules changed from being a risk of some (or even any) harm, to a substantial risk of serious harm to Plaintiff. A reasonable prison official understanding that he could not recklessly disregard

10

a serious risk to inmate safety could know that Plaintiff had voiced his objections in front of the other inmates, and Martin had asked Betancourt for assistance in talking to Plaintiff about the matter and even appeared agitated with Plaintiff's response, but reasonably perceive that Plaintiff's exposure to any harm was not that high when there was no evidence of a specific threat or even knowledge of a possible threat from Martin to Plaintiff. Because the law did not put Defendant Betancourt on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate. *See Saucier*, 533 U.S. at 202.

    C.    <u>Retaliation Claim</u>

A claim may be stated under § 1983 where a plaintiff alleges retaliation by state actors for the exercise of his First Amendment rights. *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977). Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)). In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* (quoting *Sandin*, 515 U.S. at 482).

To survive summary judgment on his retaliation claim, Plaintiff must present evidence: (1) that he engaged in activity protected under the First Amendment, (2) that the protected conduct was a substantial or motivating factor for Defendant Betancourt's alleged retaliatory acts, (3) that such acts harmed Plaintiff, and (4) that Defendant Betancourt's actions did not advance a legitimate correctional goal. *Rhodes v. Robinson*, 380 F.3d 1123, 1130 (9th Cir. 2004); *Pratt*, 65 F.3d at 806; *Barnett v. Centoni*, 31 F.3d 813, 816 (9th Cir. 1994).

Retaliation is not established simply by showing adverse activity by the defendant after protected speech; rather, the plaintiff must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir. 2000). However, retaliatory motive may be shown by the timing of the alleged retaliatory act, as well as by direct evidence. *Bruce v.*

11

*Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003).

A prisoner suing prison officials under § 1983 for retaliation must show that the retaliatory action did not advance legitimate penological goals, such as preserving institutional order and discipline. *Pratt*, 65 F.3d at 806. In *Pratt*, the court made clear that the plaintiff "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Id*. On summary judgment, if the plaintiff can produce evidence making such a showing, then the burden shifts to the prison official to produce evidence showing that the retaliatory action was narrowly tailored to advance a legitimate correctional goal. *Rhodes*, 380 F.3d at 1130; *Schroeder v. McDonald*, 55 F.3d 454, 461-62 (9th Cir. 1995).

Plaintiff alleges that Defendant Betancourt retaliated against him because Plaintiff voiced objections to the work schedule changes. Plaintiff relies upon a series of events to support his claim. First, he states that Defendant Betancourt had no legitimate reason for changing the work schedules in the first place. This does not support Plaintiff's claim, however, because there is no preceding First Amendment expression which Plaintiff alleges he engaged in prior to the rescheduling, and the rescheduling pertained to many inmates, not just Plaintiff.

Next, Plaintiff states that Defendant Betancourt discussed the proposed changes with inmate Martin first, thereby creating a "situation between prisoners." Again, however, this action did not follow any alleged expression of First Amendment rights by Plaintiff, and was not directed at Plaintiff, although Plaintiff appears to maintain that Defendant Betancourt knew or should have known that Martin would tell Plaintiff and Plaintiff would object at the meeting with other inmates, thus setting Plaintiff up to be attacked. However, there is absolutely no support for this proposition other than Plaintiff's speculation.

Plaintiff contends that because he objected at the meeting Defendant Betancourt then either set him up or allowed him to be attacked by Martin, pepper-sprayed him without warning, and wrote up a false RVR on Plaintiff. As discussed previously, however, Plaintiff has not presented a triable issue with respect to Defendant Betancourt having acted with any

12

more that negligence in his handling of the interaction between Plaintiff and Martin. Plaintiff has not shown that he acted with a retaliatory motive. Nor has he shown, with respect to the pepper-spraying and the RVR, that Defendant Betancourt was acting other than with a legitimate penological purpose. Specifically, it is noteworthy that Defendant Betancourt pepper-sprayed *both* Martin and Plaintiff, and that *both* received RVRs. Moreover, at Plaintiff's RVR hearing, Defendant Betancourt testified that Plaintiff had not attacked Martin and had acted in self-defense, resulting in the dismissal of the RVR against Plaintiff.

       Plaintiff maintains that Defendant Betancourt acted with a retaliatory motive when he changed Plaintiff's work schedule again after the incident. But Plaintiff provides no probative evidence to support his assertion, and Defendant Betancourt has presented a legitimate penological purpose for the work schedule change: Plaintiff was absent from work while the RVR was being decided and Defendant Betancourt had to change the schedule to accommodate his absence.

       Finally, Plaintiff maintains that Defendant Betancourt acted with a retaliatory motive when he wrote a 128-B Chrono saying that Plaintiff's performance was poor and he had an attitude problem on dates when Plaintiff was not even working. Plaintiff appealed this issue and Defendant Betancourt admitted he had noted incorrect dates and voluntarily removed the Chrono. This information alone, however, does not support an inference of retaliation. The only precipitating event alleged by Plaintiff is his voiced objection to Defendant Betancourt's first work schedule change, some time before April 16, 2003. However the Chrono was purportedly written on May 7, 2003 (and alleged by Plaintiff to have been written even later), after Defendant Betancourt already had testified in favor of Plaintiff's theory of self-defense at the RVR hearing and the charges against Plaintiff were dismissed. Thus, Plaintiff has not shown that his protected conduct was the substantial or motivating factor behind Defendant Betancourt's writing of the Chrono. Moreover, Defendant Betancourt admitted his error and removed the Chrono from Plaintiff's file and also changed Plaintiff's work schedule back to the one he wanted.

Plaintiff has not shown that Defendant Betancourt acted with a retaliatory motive with respect to the alleged series of events. Accordingly, summary judgment is GRANTED to Defendant Betancourt on this claim.

### D.  Supplemental State Law Claims

Defendants Betancourt, Friedman, Hamlet and Alameida ask the Court to retain jurisdiction over Plaintiff's supplemental state law claims against them and to find that they are entitled to qualified immunity. The Court declines to exercise supplemental jurisdiction over the state law claims now that the federal question claims have been dismissed. *See* 28 U.S.C. § 1367(c)(3). Plaintiff ought to be allowed to litigate his state law claims in state court where he first asserted those claims. The case therefore is be remanded to state court. *See Swett v. Schenk*, 792 F.2d 1447, 1450 (9th Cir. 1986) ("it is within the district court's discretion, once the basis for removal jurisdiction is dropped, whether to hear the rest of the action or remand it to the state court from which it was removed"); *Plute v. Roadway Package System, Inc.*, 141 F. Supp. 2d 1005, 1007 (N.D. Cal. 2001) (court may remand *sua sponte* or on motion of a party).

### CONCLUSION

The motion for summary judgment is GRANTED as to the federal constitutional claims brought against Defendant Betancourt. (Docket no. 29.) The remaining state law claims against Defendants Betancourt, Friedman, Hamlet and Alameida are REMANDED to Santa Clara County Superior Court for such other and further proceedings as that court deems proper. The Clerk of the Court shall enter judgment on behalf of Defendant Betancourt with respect to the federal constitutional claims, close the file and send the necessary materials to the Santa Clara County Superior Court for the remand (Santa Clara County Superior Court, Case No. 1-03-CV-007839).

**IT IS SO ORDERED.**

Dated: February 13, 2006

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE